I. Introduction
 

 The North Carolina Supreme Court described the State's constitutional obligation to provide each student a "sound basic education" in
 
 Leandro v. State
 

 [1]
 
 , which was filed in 1997; the Halifax County Board of Education was one of several plaintiffs in that case. In
 
 Leandro I
 
 , our Supreme Court declared that the State bears the constitutional obligation to provide a "sound basic education" to each student; the Court then explained in later
 
 Leandro
 
 litigation that "by the State we mean the legislative and executive branches[.]"
 
 [2]
 
 The legislative branch is the North Carolina General Assembly; the executive branch includes the Governor, State Board of Education, and Department of Public Instruction. The Supreme Court also explained that our state courts are not well-equipped to solve the problems in North Carolina's public schools. The Court approved of the trial court's approach, which deferred to "the expertise of the executive and legislative branches of government in matters concerning the mechanics of the public education process."
 
 [3]
 
 The Supreme Court then assigned a superior court judge to oversee the efforts to improve public education in several counties, including Halifax County, and the court oversight started by
 
 Leandro
 
 still continues today.
 

 In this case, plaintiffs are students in the Halifax County Public Schools and organizations interested in promoting public education. They claim that despite years of
 
 Leandro
 
 court oversight, including countless hearings and orders by the trial court and two extensive opinions from the North Carolina Supreme Court, many of the educational deficiencies described in
 
 Leandro I
 
 and
 
 II
 
 still exist in Halifax County. But in this case, plaintiffs claim that the Halifax County
 
 Board of Commissioners
 
 -alone-bears the constitutional obligation for providing all children in the county with a sound basic education. This claim is not supported by our Supreme Court's holdings in
 
 Leandro I
 
 and
 
 II
 
 . And the courts are still ill-equipped to solve the problems of North Carolina's
 public schools today, while the State-"the legislative and executive branches"-still has the constitutional duty to provide a sound basic education for every child in North Carolina. The defendant Halifax County Board of Commissioners was created by the State, and the State has legal power to control it. Plaintiffs' complaint describes serious problems in the schools in Halifax County, but because this defendant-the Halifax County Board of Commissioners-does not bear the constitutional duty to provide a sound basic education, we affirm the trial court's order dismissing this action.
 

 II. Plaintiffs' claim
 

 a.
 
 Procedural background
 

 This case presents a question of first impression in our Court: whether North Carolina schoolchildren may assert a violation of their right to a sound basic public education, guaranteed by the North Carolina Constitution, against a local board of county commissioners for their alleged failure to adequately fund aspects of public schools. This case has come before this Court at an early stage of the proceedings, as the trial court granted defendant's motion to dismiss under Rule 12(b)(6). At this early stage, this Court must take the factual allegations from plaintiffs' complaint, and treat them as true to determine the legal question of whether the trial court properly dismissed this case.
 
 See
 

 Bridges v. Parrish
 
 ,
 
 366 N.C. 539
 
 , 541,
 
 742 S.E.2d 794
 
 , 796 (2013) (noting that in an appeal from a trial court's grant of a motion to dismiss under Rule 12(b)(6), "[w]e consider
 whether the allegations of the complaint, if treated as true, are sufficient to state a claim upon which relief can be granted under some legal theory." (citation and quotation marks omitted)).
 

 Brianna Silver, Larry Silver III, Dominick Silver, Alicia Jones, and Jamier Scott ("the students") are five students in school systems within the geographic boundaries of Halifax County, North Carolina. Latonya Silver, Brenda Sledge, and Felicia Scott are the students' respective parents or legal guardians. The students and their parents and legal guardians, as well as with two interested organizations-the local chapter of the National Association for the Advancement of Colored People and the Coalition for Education and Economic Security (collectively, "plaintiffs")-filed a complaint against the Halifax County Board of Commissioners ("defendant" or "the Board") asserting that the Board's ineffective and inefficient allocation of financial resources resulted in a failure to provide a "sound basic education" to all school children within Halifax County, and that such failure violated the students' rights under Article I, Section 15 and Article IX, Section 2 of the North Carolina Constitution.
 

 Plaintiffs filed their lawsuit in Halifax County Superior Court on 24 August 2015. In their complaint, plaintiffs asserted that, due to the "educational deficiencies" in the three Halifax County school districts, "merely adding resources to the defective three-district system cannot remedy its constitutional deficiencies." Plaintiffs also claim that the Board's "decision to maintain three racially identifiable school districts prevents students from the opportunity to receive a sound basic education." Plaintiffs asserted two claims for relief, both based on Article I, Section 15 and Article IX, Section 2 of the North Carolina Constitution, and requested in part: (1) "[t]hat the Court find and conclude that Defendant's maintenance of three separate school districts obstructs Halifax County's students from securing the opportunity to receive a sound basic education;" and (2) "[t]hat the Court exercise its equitable powers and order the Board to develop and implement a plan to remedy the constitutional violations of its present education delivery mechanism and to ensure that every student in Halifax County is provided the opportunity to receive a sound basic education[.]"
 

 Under Rule 2.1 of the General Rules of Practice for the Superior and District Courts, this case was designated as exceptional by the Chief Justice of the Supreme Court of North Carolina, and a special superior court judge was designated to hear the case. Defendant moved to dismiss plaintiffs' complaint under Rule 12(b)(6) on 2 November 2015, asserting that the complaint failed to state a claim upon which relief may be granted. After a hearing, the trial court granted defendant's motion to dismiss under Rule 12(b)(6), reasoning it is not "the constitutional responsibility of [the Board] to implement and maintain a public education system for Halifax County." Plaintiffs appealed to this Court.
 

 b.
 
 Facts as alleged by plaintiffs
 

 We recite these factual allegations from plaintiffs' complaint and treat them as true for the purposes of our decision.
 
 Bridges
 
 ,
 
 366 N.C. at 541
 
 ,
 
 742 S.E.2d at 796
 
 . Three separate school districts exist wholly within the geographical boundaries of Halifax County: Halifax County Public Schools ("Halifax County Schools"), Weldon City Schools ("Weldon City Schools"), and Roanoke Rapids Graded School District ("Roanoke Rapids Schools"). This tripartite school system was created in the 1960s.
 

 As of 2015, the student population of Halifax County Schools was 85% African-American and 4% Caucasian; the student population of Weldon City Schools was 94% African-American and 4% Caucasian; and the student population of Roanoke Rapids Schools was 26% African-American and 65% Caucasian. According to plaintiffs' complaint, the three school
 districts receive an unequal amount of funding, with Roanoke Rapids Schools-the only school district with a majority of Caucasian students-receiving the most financial support. Plaintiffs allege this funding disparity flows directly from the choices made by the Board.
 

 Plaintiffs also allege the Board has financial responsibility for public education in Halifax County, and has the authority to use
 local revenues to maintain or supplement public school programs. Various North Carolina General Statutes assign to local governments the responsibility to pay for certain school-related expenditures for the school districts within its borders; the complaint alleges that the Board is responsible for providing furniture and apparatus needs; library, science, and classroom equipment; instructional supplies and books; and water supply and sanitary facilities. To fund these financial responsibilities, North Carolina law allows local governments, if they choose, to collect a one-cent sales and use tax.
 
 N.C. Gen. Stat. § 105-463
 

 et seq.
 
 This tax is collected by retailers and remitted to the North Carolina Department of Revenue.
 
 N.C. Gen. Stat. §§ 105-469
 
 (a) ; 105-471 (2015). The Secretary of the Department of Revenue then allocates the net proceeds of the taxes collected to each individual county.
 
 N.C. Gen. Stat. § 105-472
 
 (2015).
 

 Leandro v. State
 
 ,
 
 346 N.C. 336
 
 ,
 
 488 S.E.2d 249
 
 (1997) ("
 
 Leandro I
 
 ").
 

 Id
 
 . at 345,
 
 488 S.E.2d at
 
 254 ;
 
 Hoke Cnty. Bd. of Educ. v. State
 
 ,
 
 358 N.C. 605
 
 , 635,
 
 599 S.E.2d 365
 
 , 389 (2004) ("
 
 Leandro II
 
 ").
 

 Leandro II
 
 ,
 
 358 N.C. at 638
 
 ,
 
 599 S.E.2d at 390
 
 .
 

 In distributing the local government sales and use tax proceeds, the General Statutes allow the Board, by resolution, to choose one of two methods of tax distribution: the Per Capita Method, or the Ad Valorem Method.
 
 See
 

 N.C. Gen. Stat. §§ 105-472
 
 (b)(1)-(2) (2015). For counties that choose the Per Capita Method, the "net proceeds of the [sales and use] tax collected in a taxing county" is distributed "to that county and to the municipalities in the county on a per capita basis according to the total population of the taxing county, plus the total population of the municipalities in the county."
 
 N.C. Gen. Stat. § 105-472
 
 (b)(1). For counties using the Ad Valorem Method, the "net proceeds of the [sales and use] tax collected in a taxing county" is distributed "to that county and the municipalities in the county in proportion to the total amount of ad valorem taxes levied by each on property having a tax situs in the taxing county during the fiscal year next preceding the distribution."
 
 N.C. Gen. Stat. § 105-472
 
 (b)(2). According to the complaint, both Roanoke Rapids Schools and Weldon City Schools levy ad valorem "supplemental property taxes," while Halifax County Schools do not.
 

 The Board distributes local sales and use tax revenue under the Ad Valorem Method. Plaintiffs' complaint alleges that because the Board chooses the Ad Valorem Method, a funding disparity exists among the three school districts. Between 2006 and 2014, it is alleged that Roanoke Rapids Schools received approximately $4.5 million in local sales and use
 tax revenue, Weldon City Schools received approximately $2.5 million in local sales and use tax revenue, and Halifax County Schools received no local sales and use tax revenue, because it does not collect ad valorem taxes and was therefore not entitled to a share of the local sales and use taxes distributed under the Ad Valorem Method. Plaintiffs allege the Board has "repeatedly refused to adopt" the Per Capita Method, "preferring to maintain a public education system that denies additional funding" to Halifax County Schools.
 

 The Board's choice not to adopt the Per Capita Method "exacerbates funding disparities already in place," according to plaintiffs, by the fact that Roanoke Rapids Schools and Weldon City Schools collect ad valorem supplemental property tax revenue, while Halifax County Schools does not. Roanoke Rapids Schools has "authority to levy its own taxes," and plaintiffs allege it set a supplemental property tax rate at $0.21 per $100.00 of taxable property value within the school district, which resulted in Roanoke Rapids Schools receiving approximately $15 million in additional revenue through supplemental property taxes between 2006 and 2014. Plaintiffs allege Weldon City Schools "relies on the Board to set its supplemental property tax rate," and the Board set the rate at $0.17 per $100.00 of taxable property value, resulting in Weldon City Schools receiving approximately $11 million in additional revenue through supplemental property taxes during the same time period. In contrast, Halifax County Schools do "not have a supplemental property tax and thus receive[ ] no additional revenue," according to plaintiffs' complaint. Plaintiffs allege these funding disparities have had an appreciable effect on each of the school districts' facilities, quality of teachers, and learning materials, briefly summarized below.
 

 The complaint alleges that many of Halifax County Schools' buildings are in subpar condition,
 resulting in: toilets flooding hallways, forcing students to walk through sewage to travel between their lockers and classes; a ceiling occasionally crumbling and falling onto students' desks mid-lesson; heating and air conditioning systems regularly failing; and school buses breaking down, affecting class schedules and school attendance. The complaint further alleges that Weldon City Schools are not much better off. The high school in the Weldon City School system has a mold infestation, crumbling ceilings, an invasive pest problem, and rodents. An elementary school in the Weldon City Schools system has bathrooms with no bathroom stall doors and routinely has no soap in the soap dispensers. Plaintiffs allege, in stark contrast, that Roanoke Rapids Schools have been renovated regularly; feature computer labs,
 art rooms, music rooms, and physical education spaces; and have "pristine athletic field[s]."
 

 Plaintiffs also allege that disparities extend to the quality of the faculty in the three school districts. They allege Halifax County Schools and Weldon City Schools (together, the "majority-minority districts") are "unable to attract and retain a sufficient number of experienced, highly effective, or qualified teachers." The complaint alleges 40 percent and 50 percent of the school districts' teachers, respectively, reported that they have insufficient access to appropriate instructional materials, while only five percent of Roanoke Rapids Schools teachers reported the same problems. Plaintiffs allege the majority-minority districts must resort to teachers provided through Teach For America ("TFA"), while Roanoke Rapids Schools have no TFA teachers placed in its schools.
 

 Plaintiffs further allege differences between the three school districts' learning materials, curricular offerings, and extracurricular activities, with students in the majority-minority districts being "frequently forced to share old and worn down textbooks, workbooks, and other classroom materials[,]" and students are not permitted to take those materials home, making it difficult to complete homework assignments. Students in the majority-minority districts have minimal access to advanced academic courses. In contrast, students in Roanoke Rapids Schools have access to an "Outreach Academy" program designed to decrease the dropout rate, have wide access to advanced academic placement, and can participate in "educational inputs like extracurricular and athletic offerings[.]"
 

 In addition, plaintiffs allege that the school funding choices made by the Board have also had a negative impact on student test scores in the three districts. Since 2008, Halifax County Schools and Weldon City Schools have had no more than 31.7% and 47.7%, respectively, of their students score at or above grade level on statewide standardized tests. They allege students in these two school districts have consistently scored significantly lower on the SAT college entrance exams than their peers at Roanoke Rapids Schools. While students at Roanoke Rapids Schools have fared better, all three districts have higher dropout rates than the state average, with half of the dropouts in Roanoke Rapids Schools being African-American, despite that group constituting less than 25 percent of the total student population.
 

 III. Analysis
 

 a.
 
 The
 
 Leandro
 
 cases established a constitutional right to a sound basic education.
 

 "[T]he right to education provided in the state constitution is a right to a sound basic education."
 

 Leandro I,
 

 346 N.C. at 345
 
 ,
 
 488 S.E.2d at 254
 
 .
 

 Plaintiffs argue that their complaint, taken as true, states a claim against defendant for violating their rights conferred by Article I, Section 15 and Article IX, Section 2 of the North Carolina Constitution, and the Board's choices "deprived Plaintiffs of their constitutionally-guaranteed opportunity to receive a sound basic education." "It has long been understood that it is the duty of the courts to determine the meaning of the requirements of our Constitution."
 
 Leandro I
 
 ,
 
 346 N.C. at 345
 
 ,
 
 488 S.E.2d at 253
 
 . To determine whether plaintiffs' claims against the Board, if true, constitute a violation of the North Carolina Constitution, we first consider the language of the two constitutional provisions involved. Article I, Section 15 of the North Carolina Constitution provides:
 

 "
 
 Education
 
 . The people have a right to the privilege of education, and it is the duty of the State to guard and maintain that right." N.C. CONST. art. I, § 15 (emphasis in original). Article IX, section 2 provides:
 

 Uniform system of schools.
 

 (1)
 
 General and uniform system: term
 
 .-The General Assembly shall provide by taxation and otherwise for a general and uniform system of free public schools, which shall be maintained at least nine months in every year, and wherein equal opportunities shall be provided for all students.
 

 (2)
 
 Local responsibility
 
 .-The General Assembly may assign to units of local government such responsibility for the financial support of the free public schools as it may deem appropriate. The governing boards of units of local government with financial responsibility for public education may use local revenues to add to or supplement any public school or post-secondary school program.
 

 N.C. CONST. art. IX, § 2 (emphasis in original). The contours of these constitutional provisions have been examined in two landmark opinions of our Supreme Court:
 
 Leandro I
 
 ,
 
 346 N.C. 336
 
 ,
 
 488 S.E.2d 249
 
 ; and
 
 Leandro II
 
 ,
 
 358 N.C. 605
 
 ,
 
 599 S.E.2d 365
 
 .
 

 In
 
 Leandro I
 
 , students, their parents or legal guardians, and their school districts
 
 [4]
 
 ("the plaintiffs"), sued the State and the North Carolina State Board of Education ("SBOE") (collectively, "the defendants") alleging: (1) that the children in five relatively poor school districts had a right to adequate educational opportunities which the defendants had denied under the then-existing school funding system; and (2) the North Carolina Constitution "not only creates a fundamental right to an education, but it also guarantees that every child, no matter where he or she resides, is entitled to equal educational opportunities."
 
 346 N.C. at 342
 
 ,
 
 488 S.E.2d at 252
 
 . Much like the present case, the plaintiffs in
 
 Leandro I
 
 "complain[ed] of inadequate school facilities with insufficient space, poor lighting, leaking roofs, erratic heating and air conditioning, peeling paint, cracked plaster, and rusting exposed pipes."
 

 Id.
 

 at 343
 
 ,
 
 488 S.E.2d at 252
 
 . The plaintiff school districts asserted that "they [were] unable to compete for high quality teachers because local salary supplements in their poor districts [were] well below those provided in wealthy districts."
 

 Id.
 

 After examining the plain language, purpose, and history of Article I, Section 15 and Article IX, Section 2 of the North Carolina Constitution, our Supreme Court held these provisions provide a right to "a qualitatively adequate education[.]"
 
 Leandro I
 
 ,
 
 346 N.C. at 345
 
 ,
 
 488 S.E.2d at 254
 
 . The Court explained:
 

 Article I, Section 15 and Article IX, Section 2 of the North Carolina Constitution combine to guarantee every child of this state an opportunity to receive a sound basic education in our public schools. For purposes of our Constitution, a "sound basic education" is one that will provide the student with at least: (1) sufficient ability to read, write, and speak the English language and a sufficient knowledge of fundamental mathematics and physical science to enable the student to function in a complex and rapidly changing society; (2) sufficient fundamental knowledge of geography, history, and basic economic and political systems to enable the student to make informed choices with regard to issues that affect the student personally or affect the student's community, state, and nation; (3) sufficient academic and vocational skills to enable the student to successfully engage in post-secondary education or vocational
 training; and (4) sufficient academic and vocational skills to enable the student to compete on an equal basis with others in further formal education or gainful employment in contemporary society.
 

 Leandro I
 
 ,
 
 346 N.C. at 347
 
 ,
 
 488 S.E.2d at 255
 
 (citations omitted).
 

 In addition to considering the qualitative aspect inherent in the two constitutional provisions when combined, the Supreme Court
 also considered whether the equal opportunities clause of Article IX, Section 2, alone, "mandates equality in the educational programs and resources offered the children in all school districts in North Carolina."
 
 See
 

 Leandro I
 
 ,
 
 346 N.C. at 348
 
 ,
 
 488 S.E.2d at 255
 
 . In answering that question in the negative, the Court explained:
 

 The issue here ... is [the] plaintiffs' contention that North Carolina's system of school funding, based in part on funding by the county in which the district is located, necessarily denies the students in plaintiffs' relatively poor school districts educational opportunities equal to those available in relatively wealthy districts and thereby violates the equal opportunities clause of Article IX, Section 2(1). Although we have concluded that the North Carolina Constitution requires that access to a sound basic education be provided equally in every school district, we are convinced that the equal opportunities clause of Article IX, Section 2(1)
 
 does not require substantially equal funding or educational advantages in all school districts
 
 .... [W]e conclude that provisions of the current state system for funding schools which require or allow counties to help finance their school systems and result in unequal funding among the school districts of the state do not violate constitutional principles.
 

 Leandro I
 
 ,
 
 346 N.C. at 348-49
 
 ,
 
 488 S.E.2d at 256
 
 (emphasis added). Our Supreme Court also addressed local responsibility for school funding, and held that differences in school funding between school districts resulting from local supplements do not violate Article IX, Section 2(2) :
 

 Article IX, Section 2(2) of the North Carolina Constitution expressly authorizes the General Assembly to require that local governments bear part of the costs of their local public schools. Further, it expressly provides that local governments may add to or supplement their school programs as much as they wish.... Because the North
 Carolina Constitution expressly states that units of local governments with financial responsibility for public education may provide additional funding to supplement the educational programs provided by the state,
 
 there can be nothing unconstitutional about their doing so or in any inequality of opportunity occurring as a result
 
 .
 

 Leandro I
 
 ,
 
 346 N.C. at 349-50
 
 ,
 
 488 S.E.2d at 256
 
 (emphasis added). This holding was grounded, in part, in practical concerns; because the Constitution permits local supplements, " '[c]learly ... a county with greater financial resources will be able to supplement its programs to a greater degree than less wealthy counties, resulting in enhanced educational opportunity for its students. [ Article IX, Section 2(2) ] obviously precludes the possibility that exactly equal educational opportunities can be offered' " in all school districts throughout the State.
 
 Id
 
 . at 350,
 
 488 S.E.2d at 256
 
 (quoting
 
 Britt v. N.C. State Bd. of Educ.
 
 ,
 
 86 N.C. App. 282
 
 , 288,
 
 357 S.E.2d 432
 
 , 435-36 (1987) ) (ellipses and brackets omitted).
 

 Upon concluding that the plaintiffs had stated a claim upon which relief could have been granted, our Supreme Court held that "[i]f on remand of this case to the trial court, that court makes findings and conclusions from competent evidence to the effect that defendants in this case are denying children of the state a sound basic education, a denial of a fundamental right will have been established."
 
 Id.
 
 at 357,
 
 488 S.E.2d at 261
 
 . Unless the State could show that its actions denying a fundamental right were necessary to promote a compelling governmental interest, the Court held that it would be "the duty of the [trial] court to enter a judgment granting declaratory relief and such other relief as needed to correct the wrong while minimizing the encroachment upon the other branches of government."
 

 Id.
 

 (citation omitted).
 

 As directed by
 
 Leandro I
 
 , on remand the trial court heard extensive evidence and ultimately entered a declaratory judgment favorable to the
 
 Leandro
 
 plaintiffs; our Supreme Court considered the appeal of that judgment in
 
 Leandro II
 
 .
 
 Leandro II
 
 ,
 
 358 N.C. at 612-13
 
 ,
 
 599 S.E.2d at 375
 
 . In
 
 Leandro II
 
 , our Supreme Court encountered a "continuation of the landmark decision by this Court, [
 
 Leandro I
 
 ,] unanimously interpreting the North Carolina Constitution to recognize that the legislative and executive branches
 have the duty to provide all the children of North Carolina the opportunity for a sound basic education."
 
 Leandro II
 
 ,
 
 358 N.C. at 609
 
 ,
 
 599 S.E.2d at 373
 
 . The Court considered, for the first time, what measures are to be used to determine whether a student's right to a sound basic public education had been violated.
 While the plaintiffs in
 
 Leandro I
 
 and
 
 Leandro II
 
 hailed from many poor school districts in North Carolina-including Halifax County-the evidence primarily focused on a single district, Hoke County, which was designated as a "representative plaintiff district."
 
 See
 

 id.
 
 at 613,
 
 599 S.E.2d at 375
 
 . The Court noted that the evidence presented by the
 
 Leandro II
 
 plaintiffs included four general types of evidence: "(1) comparative standardized test score data; (2) student graduation rates, employment potential, post-secondary education success (and/or lack thereof); (3) deficiencies pertaining to the educational offerings in Hoke County schools; and (4) deficiencies pertaining to the educational administration of Hoke County schools."
 
 Id.
 
 at 623,
 
 599 S.E.2d at 381
 
 . The Court called the first two categories "outputs," and the second two categories as "inputs."
 

 Id.
 

 "Outputs" is "a term used by educators that, in sum, measures student performance[,]" while "inputs" is "a term used by educators that, in sum, describes what the State and local boards provide to students attending public schools."
 

 Id.
 

 After discussing the evidence in the case regarding "outputs" and "inputs," our Supreme Court held that the plaintiffs had made a "clear evidentiary showing" of the inadequacy of both.
 
 See
 

 id.
 
 at 630,
 
 599 S.E.2d at 386
 
 . The Court stated:
 

 In our view, the trial court conducted an appropriate and informative path of inquiry concerning the issue at hand. After determining that the evidence clearly showed that Hoke County students were failing, at an alarming rate, to obtain a sound basic education, the trial court in turn determined that the evidence presented also demonstrated that a combination of State action and inaction contributed significantly to the students' failings. Then, after concluding that the State's overall funding and resource provisions scheme was adequate on a statewide basis, the trial court determined that the evidence showed that the State's method of funding and providing for individual school districts such as Hoke County was such that it did not comply with
 
 Leandro
 

 's
 
 mandate of ensuring that all children of the state be provided with the opportunity for a sound basic education.
 

 Id.
 
 at 637,
 
 599 S.E.2d at 390
 
 . Accordingly, our Supreme Court affirmed "those portions of the trial court's order that conclude[d] that there [had] been a clear showing of a denial of the established right of Hoke County students to gain their opportunity for a sound basic education" and also affirmed the portions of the order which required "the State to
 assess its education-related allocations to the county's schools so as to correct any deficiencies that ... prevent[ed] the county from offering its students the opportunity to obtain a
 
 Leandro
 
 -conforming education."
 
 Id.
 
 at 638,
 
 599 S.E.2d at 391
 
 .
 

 With these principles in mind, we consider plaintiffs' complaint. In their complaint, plaintiffs allege that Halifax County Schools and Weldon City Schools lack the necessary resources to provide fundamental educational opportunities to the children in their school districts. Plaintiffs further complain of inadequate school facilities, crumbling ceilings, leaking pipes, sewage in the hallways, and a lack of adequate instructional materials in the majority-minority districts. These deficiencies result from defendant's funding choices and have led to poor test scores and the inability to retain qualified teachers. Plaintiffs requested, in their complaint, that the Court "exercise its equitable powers and order the Board to develop and implement a plan to remedy the constitutional violations of its present education delivery mechanism and to ensure that every student in Halifax County is provided the opportunity to receive a sound basic education."
 

 The educational deficiencies as described in the plaintiffs' complaint, which we accept as true for the motion to dismiss, are serious and intolerable. But rather than filing this separate lawsuit, the correct avenue for addressing
 plaintiffs' concerns in the present case would appear to be through the ongoing litigation in
 
 Leandro I
 
 and
 
 Leandro II
 

 .
 
 The
 
 Leandro
 
 cases defined not only the essential requirements for a "sound basic education" under the North Carolina constitution, but also the entities with the constitutional responsibility to provide that education. In addition, these cases answer the essential question in this case of whether a local board of county commissioners has the constitutional obligation for providing a sound basic public education for the students in its county. The Halifax County schools are addressed in many orders in the ongoing court supervision in the
 
 Leandro
 
 cases. As noted above, several plaintiffs in
 
 Leandro I
 
 and
 
 II
 
 are local boards of education, including the Halifax County Board of Education.
 
 See
 

 Leandro I
 
 ,
 
 346 N.C. at 336
 
 ,
 
 488 S.E.2d at
 
 249 ;
 
 Leandro II
 
 ,
 
 358 N.C. at 605
 
 ,
 
 599 S.E.2d at 365
 
 . Furthermore, plaintiffs' complaint refers to a 2009 consent order that "determined that students in HCPS were not being provided the opportunity to receive a sound basic education and required the North Carolina Department of Public Instruction's [sic] ('DPI') to implement a 'turnaround' intervention plan in HCPS." Oddly, the complaint does not identify the case or court in which the "2009 consent order" was entered, but we believe it is entirely appropriate for this Court to take judicial notice it was a court order in the ongoing
 
 Leandro
 
 litigation.
 On plaintiffs' argument that this defendant-a county board of commissioners-has the constitutional obligation to provide a sound basic education, we cannot lose sight of the fact that the
 
 Leandro
 
 cases began as a declaratory judgment action with the express purpose of determining the extent of the state constitutional right to a sound basic education
 
 and
 
 the entities responsible for providing that education.
 
 Leandro II
 
 ,
 
 358 N.C. at 611
 
 ,
 
 599 S.E.2d at 374
 
 .
 
 Leandro I
 
 and
 
 Leandro II
 
 determined the correct parties and the entities legally responsible for providing a sound basic education under the North Carolina Constitution; county commissioners were not included as parties in either case.
 
 Leandro II
 
 addressed the responsibilities of the various entities-the State, the local school boards, and the State Board of Education-and held that the local entities, as creatures of the State, did
 
 not
 
 bear the constitutional obligation regarding education, yet found the school boards to still be proper parties to the ongoing litigation, since the case was based significantly on their role as the providers of education and the outcome would have a great effect on that role.
 
 Leandro II
 
 ,
 
 358 N.C. at 617
 
 ,
 
 599 S.E.2d at 378
 
 . In
 
 Leandro II
 
 , the Supreme Court also clarified that the constitutional duty is on the State, and "by the State we mean the legislative and executive branches which are constitutionally responsible for public education[.]"
 
 Id.
 
 at 635,
 
 599 S.E.2d at 389
 
 . Although the county boards of commissioners were not parties to
 
 Leandro I
 

 or
 

 II
 
 , they are creatures of the State just as the local school boards.
 

 We cannot discern why deficiencies in education alleged here have not been raised with the superior court in the ongoing
 
 Leandro II
 
 matter. And even if these particular deficiencies cannot be addressed in the ongoing
 
 Leandro II
 
 case, plaintiffs simply have not stated a constitutional claim against
 
 this
 
 defendant, the Halifax County Board of Commissioners, because
 
 this
 
 defendant on its own does not have the constitutional duty identified in
 
 Leandro I
 
 to provide a sound basic education. The State does
 
 , and the State has total control over this defendant.
 
 We will review briefly the basic principles of
 
 Leandro I
 
 and
 
 II
 
 specifically as applied to the plaintiffs' claims and the schools in Halifax County.
 

 b.
 

 Leandro I
 
 and
 
 II
 
 established that the State is constitutionally responsible for public education.
 

 "[B]y the State we mean the legislative and executive branches which are constitutionally responsible for public education."
 

 Leandro II,
 

 358 N.C. at 635
 
 ,
 
 599 S.E.2d at 389
 
 .
 

 The seminal case in North Carolina which establishes the constitutional right to sound basic education is
 
 Leandro I
 
 ,
 
 346 N.C. at 345
 
 ,
 
 488 S.E.2d at 254
 
 , with further analysis and clarification in
 
 Leandro II
 
 ,
 
 358 N.C. at 614-15
 
 ,
 
 599 S.E.2d at 376
 
 . The questions of how to correct educational deficiencies and which
 entities bear the responsibility for improving education have been addressed many times and in excruciating detail in
 
 Leandro I
 
 ,
 
 Leandro II
 
 , and continuing litigation that has followed these decisions over the years.
 
 [5]
 

 Leandro I
 
 , as described in
 
 Leandro II
 
 , was "initiated as a declaratory judgment action pursuant to [N.C. Gen. Stat.] § 1-253 (2003)."
 
 Leandro II
 
 ,
 
 358 N.C. at 611
 
 ,
 
 599 S.E.2d at 374
 
 .
 

 [T]he case included five distinct parties: (1) plaintiff school children (and their respective guardians), (2) plaintiff local school boards, (3) plaintiff-intervenors, (4) the State Board of Education, and (5) the State.
 
 At that juncture, all participants sought a decree defining what rights and obligations were at stake, which parties had obligations, and which parties had rights as a result of such obligations.
 
 In
 
 Leandro
 
 , this Court, in sum, decreed that the State and State Board of Education had constitutional obligations to provide the state's school children with an opportunity for a sound basic education, and that the state's school children had a fundamental right to such an opportunity. As a result of the decree, adversarial sides were clearly drawn for four of the five parties-plaintiff school children and plaintiff-intervenor school children (who, under the decree, enjoyed the right of educational opportunity), versus the State and State Board of Education (which, under the decree, were obligated to provide such opportunity).
 

 Id
 
 . at 614-15,
 
 599 S.E.2d at 376
 
 (citation omitted) (emphasis added). One of the plaintiff school boards in
 
 Leandro I
 
 and
 
 II
 
 was-and still is-the
 Halifax County Board of Education.
 
 Leandro I
 
 ,
 
 346 N.C. at 336
 
 ,
 
 488 S.E.2d at 249
 
 .
 

 In
 
 Leandro II
 
 , the Supreme Court addressed an issue which developed after the
 
 Leandro I
 
 ruling regarding the status of the school boards as parties, since "as state-created entities, they enjoyed no entitlement to the right established in
 
 Leandro
 
 -namely, a child's individual right of an opportunity to a sound basic education."
 
 Leandro II
 
 ,
 
 358 N.C. at 617
 
 ,
 
 599 S.E.2d at 378
 
 . In the
 
 Leandro I
 
 and
 
 II
 
 litigation, the school boards being complained about were plaintiffs, not defendants, but the Supreme Court nevertheless considered the proper constitutional role and responsibility of the school boards as local entities which share in the provision of public education.
 
 See
 

 Leandro II
 
 ,
 
 358 N.C. at 617
 
 ,
 
 599 S.E.2d at 378
 
 . The Supreme Court agreed that the school boards were properly named as parties since "the ultimate decision of the trial court was likely to: (1) be based, in significant part, on their role as education providers; and (2) have an effect on that role in the wake of the proceedings."
 

 Id.
 

 In other words, the school boards are not entitled to the benefit of the constitutional right to an education, nor do they alone bear the constitutional responsibility of providing education, but since they have statutory duties to participate as education providers, they remained as parties to the lawsuit. The Supreme Court also noted that the very purpose of the declaratory judgment action was
 

 by definition, ... premised on providing parties with a means for " 'courts of record to declare rights, status, and other legal relations' " among such parties. In addition, section 1-260 of the General Statutes declares plainly that when declaratory relief is sought,
 
 all persons shall be made parties who have or claim any interest which would be affected by the declaration.
 
 Thus, while the precise party designation-i.e., plaintiffs-of the school boards may not have been readily discernible at the time of the trial, the nature of the parties' claims was such that: (1) they
 sought a declaration of rights, status, and legal relations of and among the parties; and (2) any declaration of the rights, status, and legal relations of and among the parties would affect the role played by the school boards in providing the state's children with the opportunity to obtain a sound basic education.
 

 Id.
 
 at 617-18,
 
 599 S.E.2d at 378
 
 (citations, quotation marks, brackets, ellipses, and emphasis omitted) (emphasis added). We have found no mention in
 
 Leandro I
 
 or
 
 II
 
 of adding county boards of commissioners as parties.
 

 The Supreme Court also noted in
 
 Leandro II
 
 the central roles played by the legislative and executive branches in providing public education.
 
 Id.
 
 at 635-38,
 
 599 S.E.2d at 389-91
 
 . In affirming the trial court's order directing the State to reassess educational priorities and correct "any and all education-related deficiencies[,]" the Court noted that
 

 the trial court refused to step in and direct the "nuts and bolts" of the reassessment effort. Acknowledging that the state's courts are ill-equipped to conduct, or even to participate directly in, any reassessment effort, the trial court deferred to the expertise of the executive and legislative branches of government in matters concerning the mechanics of the public education process.
 

 .... [W]e note that the trial court also demonstrated admirable restraint by refusing to dictate how existing problems should be approached and resolved. Recognizing that education concerns were the shared province of the legislative and executive branches, the trial court instead afforded the two branches an unimpeded chance, "initially at least,"
 
 see
 

 Leandro
 
 ,
 
 346 N.C. at 357
 
 ,
 
 488 S.E.2d at 261
 
 , to correct constitutional deficiencies revealed at trial. In our view, the trial court's approach to the issue was sound and its order reflects both findings of fact that were supported by the evidence and conclusions that were supported by ample and adequate findings of fact.
 

 Id.
 
 at 638,
 
 599 S.E.2d at 390-91
 
 .
 

 When the
 
 Leandro
 
 cases were decided, North Carolina's laws regarding school district finance were essentially the same as they are now, and Halifax County schools were organized just as they are now.
 
 Leandro II
 
 noted that
 
 Leandro I
 
 carefully distinguished the responsibilities and rights of the "five distinct parties: (1) plaintiff school children (and their respective guardians), (2) plaintiff local school boards, (3) plaintiff-intervenors, (4) the State Board of Education, and (5) the State."
 
 Leandro II
 
 ,
 
 358 N.C. at 614
 
 ,
 
 599 S.E.2d at 376
 
 . Although county commissioners levied property taxes and budgeted funds for schools at the time of the
 
 Leandro
 
 cases, just as they do now, the county commissioners for the counties in which the plaintiff local school boards were located were not parties to
 
 Leandro I
 
 , nor were they discussed, at least not initially.
 
 Leandro I
 
 ,
 
 346 N.C. at 336
 
 ,
 
 488 S.E.2d at 249
 
 .
 

 In
 
 Leandro II
 
 , the Supreme Court stressed that the duty to provide a sound basic education is the State's duty, but the local entities, including
 the school boards, are simply creatures of the State.
 
 Leandro II
 
 ,
 
 358 N.C. at 635
 
 ,
 
 599 S.E.2d at 389
 
 . In fact, the trial court had even excluded "the Hoke County School System from responsibility for correcting allocation deficiencies" because the "Local Educational Area" was a "subdivision of the State created solely by the State:"
 
 [6]
 

 Concerning the State's argument that the trial court erred in concluding that the
 State was liable for its failings in Hoke County schools, we note that the trial court later modified this portion of its order to exclude the Hoke County School System from responsibility for correcting allocation deficiencies, reasoning that since the [Local Educational Area, hereinafter LEA] was a subdivision of the State created solely by the State, it held no authority beyond that accorded it by the State. As a consequence of the LEA's limited authority, the trial court concluded that the State bore ultimate responsibility for the actions and/or inactions of the local school board, and that it was the State that must act to correct those actions and/or inactions of the school board that fail to provide a
 
 Leandro
 
 -conforming educational opportunity to students.
 

 In the State's view, any holding that renders the State, and by the State we mean the legislative and executive branches which are constitutionally responsible for public education, accountable for local school board decisions somehow serves to undermine the authority of such school boards. This Court, however, fails to see any such cause and effect. By holding the State accountable for the failings of local school boards, the trial court did not limit either: (1) the State's authority to create and empower local school boards through legislative or administrative enactments, or (2) the extent of any powers granted to such local
 school boards by the State. Thus, the power of the State to create local agencies to administer educational functions is unaffected by the trial court's ruling, and any powers bestowed on such agencies are similarly unaffected. In short, the trial court's ruling simply placed responsibility for the school board's actions on the entity-the State-that created the school board and that authorized the school board to act on the State's behalf. In our view, such a conclusion bears no effect whatsoever on the local school board's ability to continue in administering those functions it currently oversees or to be given broader and/or more independent authority. As a consequence, we hold that the State's argument concerning a diminished role for local school boards as a result of the trial court's ruling is without merit.
 

 Id.
 
 at 635-36,
 
 599 S.E.2d at 388-89
 
 .
 

 The plaintiffs' complaint here seeks to invoke the constitutional rights established by
 
 Leandro I
 
 , but then asks the trial court to assign that constitutional responsibility to the defendant county commissioners alone-despite the Supreme Court's very specific rulings on the allocation of the constitutional duties from
 
 Leandro I
 
 in
 
 Leandro II
 
 .
 
 Leandro II
 
 ,
 
 358 N.C. at 617
 
 ,
 
 599 S.E.2d at 378
 
 ("While it is true that the school boards are not among those endowed with [the constitutional right to a sound basic education] ..., the school boards were properly maintained as parties because the ultimate decision of the trial court was likely to: (1) be based, in significant part, on their role as education providers; and (2) have an effect on that role in the wake of the proceedings."). Plaintiffs allege:
 

 Defendant Halifax County Board of Commissioners ("Board" or "Defendant") is constitutionally obligated to structure a system of public education that meets the qualitative mandates established by the North Carolina Supreme Court in
 
 Leandro v. State
 
 ("
 
 Leandro I
 
 ") and
 
 Hoke County v. State
 
 ("
 
 Leandro II
 
 "). The Board must provide a system that ensures the opportunity to receive a sound basic education to
 
 every
 
 child in Halifax County. But instead ... of complying with
 
 Leandro
 

 's
 
 mandate, it has chosen to maintain and fund an inefficient three-district system that divides its children along racial lines into "good" and "bad" school districts. By choosing to maintain three racially identifiable and inadequately
 funded school districts to serve this low-income community's declining population of fewer than seven thousand students, the Board violates the constitutional rights of its schoolchildren.
 

 Other allegations of the plaintiff's complaint seem to recognize the State's role-through the State Board of Education and North Carolina Department of Public Instruction-in securing the constitutional rights to education in Halifax County, but then seek to assign that obligation, once again, to defendant and solely to defendant,
 although no case has ever assigned this duty to a board of county commissioners:
 

 17. A 2009 consent order between HCPS and the State Board of Education determined that students in HCPS were not being provided the opportunity to receive a sound, basic education and required the North Carolina Department of Public Instruction's [sic] ("DPI") to implement a "turnaround" intervention plan in HCPS.
 

 18. Because of persistently low student achievement, DPI also implemented a turnaround plan in WCS.
 

 19. The limited academic improvement in both HCPS and WCS since the implementation of the DPI turnaround plans demonstrates that the Board's education delivery mechanism is an insurmountable impediment to addressing the ongoing violation of Halifax County schoolchildren's constitutional right to the opportunity to receive a sound basic education.
 

 And although the trial court, and this Court, must take the factual allegations of the complaint as true, the courts do not accept allegations of legal conclusions as correct for a motion to dismiss under Rule 12(b)(6).
 

 [T]he sufficiency of a claim to withstand a motion to dismiss is tested by its success or failure in setting out a state of facts which, when liberally considered, would entitle plaintiff to some relief. In testing the legal sufficiency of the complaint the well pleaded material allegations of the complaint are taken as admitted; but conclusions of law or unwarranted deductions of facts are not admitted. In [
 
 Sutton v. Duke
 
 ,
 
 277 N.C. 94
 
 , 102-03,
 
 176 S.E.2d 161
 
 , 166 (1970) ], the Supreme Court quoted the following passage from 2A Moore's Federal Practice § 12.08 (2d ed. 1968) in stating the rule as to when dismissal is proper: " 'A
 

 [complaint] may be dismissed on motion if clearly without any merit; and this want of merit may consist in an absence of law to support a claim of the sort made or of facts sufficient to make a good claim, or in the disclosure of some fact which will necessarily defeat the claim.' " (Emphasis added).
 

 Boyce v. Boyce
 
 ,
 
 60 N.C. App. 685
 
 , 687,
 
 299 S.E.2d 805
 
 , 806-07 (1983) (citations, quotation marks, and emphasis omitted). Many allegations of plaintiffs' complaint are allegations of legal conclusions which purport to be based upon
 
 Leandro I
 
 and
 
 II
 
 . For example, the complaint alleges that "Defendant Halifax County Board of Commissioners ('Board' or 'Defendant') is constitutionally obligated to structure a system of public education that meets the qualitative mandates established by the North Carolina Supreme Court in
 
 Leandro v. State
 
 ('
 
 Leandro I
 
 ') and
 
 Hoke County v. State
 
 ('
 
 Leandro II
 

 '
 
 )[,]" but this is an allegation of a legal conclusion and it is not correct. This allegation of the constitutional responsibilities under the
 
 Leandro
 
 cases is simply not the law, as noted above.
 

 Again, if the 2009 consent order has been violated as the complaint alleges, the court that entered the order should address the violation. At this early pleading stage, the only thing clear from plaintiffs' complaint is that their factual allegations regarding substandard school facilities and poor educational opportunities and outputs are essentially the same ones raised and addressed in
 
 Leandro I
 
 ,
 
 Leandro II
 
 , and the
 
 Leandro
 
 court supervision of the provision of public education in Halifax County is still ongoing.
 

 c.
 
 The ongoing court supervision in
 
 Leandro
 
 includes Halifax County.
 

 "The State must step in with an iron hand and get the mess straight."
 

 Hoke Cnty. Bd. of Educ. v. State, No. 95 CVS 1158,
 
 2002 WL 34165636
 
 (N.C. Super. Ct. Apr. 4, 2002) (" Judge Manning 2002 Memorandum").
 

 Court supervision of education which began in
 
 Leandro I
 
 is still continuing, and the Halifax County Board of Education is a party to that litigation, although the defendant here and the other boards of education in Halifax County are not. Trial court orders after
 
 Leandro I
 
 and
 
 Leandro II
 
 have emphasized the responsibility of the State and soundly rejected arguments that the constitutional responsibility may be shifted to a local entity. For example, in an order issued in 2002-just one of many orders issued in that litigation-Judge Howard E. Manning,
 Jr. summarized the local and state entities involved in providing education and their statutory and constitutional responsibilities.
 
 See
 

 Judge Manning 2002 Memorandum
 
 ,
 
 2002 WL 34165636
 
 . Halifax County was one of the counties specifically addressed by this 2002 order.
 

 Id.
 

 While orders issued by lower courts are not binding precedent on this Court, we cannot improve upon Judge Manning's summary of
 
 Leandro I
 
 and his overview of the statutory framework assigning responsibilities in education, so we quote that order at length and with the portions Judge Manning emphasized in all capital letters as it was written:
 

 [ ] WHO IS RESPONSIBLE FOR SEEING THAT THESE BASIC EDUCATIONAL NEEDS OF ALL CHILDREN ARE MET IN EACH CLASSROOM AND SCHOOL IN NORTH CAROLINA? THE ANSWER IS FOUND IN
 
 LEANDRO
 
 .
 

 Because we conclude that the General Assembly, under Article IX, Section 2(1), has the duty of providing the children of every school district with access to a sound basic education, we also conclude that it has inherent power to do those things reasonably related to meeting that constitutionally prescribed duty.
 
 Leandro
 
 , p. 353 [
 
 488 S.E.2d 249
 
 ].
 

 THE STATE OF NORTH CAROLINA IS ULTIMATELY RESPONSIBLE TO ENSURE THAT THE CONSTITUTIONAL GUARANTEE TO EACH CHILD OF THE OPPORTUNITY TO RECEIVE A SOUND BASIC EDUCATION IS MET. THE STATE OF NORTH CAROLINA ALSO HAS THE INHERENT POWER TO DO THOSE THINGS REASONABLY RELATED TO MEETING THAT CONSTITUTIONAL DUTY.
 

 In attempting to meet its constitutional duty to provide each child with the equal opportunity to obtain a sound basic education and to provide a General and Uniform System of schools, the Legislature has enacted legislation creating a system for delivering educational services to children, governance for that system, and has delegated responsibilities to local boards of education. The Legislature has also adopted educational goals and standards that this Court may properly consider in determining whether any children are being denied their right to a sound basic education.
 
 Leandro
 
 , p. 355 [
 
 488 S.E.2d 249
 
 ].
 

 Chapter 115C of the North Carolina General Statutes is home to many educational goals and polices, as well as the structure of the general and uniform system of schools. The Court has previously discussed newly enacted and recent legislation. Additional, pertinent sections of
 Chapter 115C follow and provide additional, clear and convincing evidence that the State of North Carolina is in fact, and in law, ultimately responsible for providing every child with the equal opportunity to obtain a sound basic education and that the educational goals adopted as policy closely align with the constitutional definition of a sound basic education[.]
 

 Id.
 

 Judge Manning then listed various statutes setting forth the State's policies on education and the duties of the various entities in providing education, including the following, with headings from the order in capital letters:
 

 N.C.G.S. 115C-1. General and uniform system of schools.
 

 STATE BOARD OF EDUCATION, N.C.G.S. 115C-12. Powers and duties of the Board generally.
 

 LOCAL BOARDS OF EDUCATION
 

 115C-35, et seq.
 

 115-36. Designation of board.
 

 115C-47. Powers and duties generally.
 

 GENERAL EDUCATION
 

 115C-81. Basic Education Program.
 

 115C-81.2. Comprehensive plan for reading achievement.
 

 115C-105.20. School-Based Management and Accountability Program.
 

 N.C.G.S. 115C-105.21. Local participation in the Program.
 

 N.C.G.S. 115C-105.27. Development and approval of school improvement plans.
 

 N.C.G.S. 115C-105.37. Identification of low-performing schools.
 

 N.C.G.S. 115C-105.37A. Continually low-performing schools; definition; assistance and intervention; reassignment of students.
 

 N.C.G.S. 115C-105.38. Assistance teams; review by State Board.
 

 N.C.G.S. 115C-105.38A. Teacher competency assurance.
 

 N.C.G.S. 115C-105.39. Dismissal or removal of personnel; appointment of interim superintendent.
 

 N.C.G.S. 115C-105.40. Student academic performance standards.
 

 SAFE SCHOOLS-MAINTAINING SAFE & ORDERLY SCHOOLS. Article 8C.
 

 N.C.G.S. 115C-105.45. Legislative findings.
 

 ACADEMICALLY OR INTELLECTUALLY GIFTED STUDENTS. Article 9B.
 

 115C-150.5. Academically or intellectually gifted students.
 

 FUNDS FOR ACADEMICALLY GIFTED STUDENTS. Budget Section 28.3
 

 FINANCIAL POLICY OF THE STATE OF NORTH CAROLINA AS IT RELATES TO THE PUBLIC SCHOOL SYSTEM.
 

 N.C.G.S. 115C-408. Funds under the control of the State Board of Education.
 

 Id.
 

 Judge Manning then summarized the responsibilities set forth in the above statutes:
 

 Under Chapter 115C's statutory scheme, the responsibility for administering and operating a general and uniform system of public schools is delegated to the State Board of Education, and the local boards of education (LEAs). Thus, by law, each LEA is statutorily responsible for providing the children within the district with the constitutionally mandated opportunity to receive the sound basic education.
 

 Under the Constitution, however, the obligation to provide each child with the equal opportunity to obtain a sound basic education may not be abdicated by the State of North Carolina nor may the ultimate responsibility be transferred to and placed on the LEAs.
 

 The State acknowledges that it may not abdicate its obligation to assure that every child has the opportunity to a sound basic education in its brief. "But, while emphasizing local control, the General Assembly, the State Board of Education and the Department of Public Instruction are not abdicating their constitutional responsibility to provide every student with the opportunity to acquire a sound basic education."
 

 It is, therefore, undisputed that the constitutional responsibility to provide each child with the equal opportunity to obtain a sound basic education remains with the State of North Carolina acting through its General Assembly.
 
 Leandro
 
 , p. 353 [
 
 488 S.E.2d 249
 
 ].
 

 Id
 
 . (record citations and italic emphasis omitted).
 

 Judge Manning completely rejected the State's arguments which sought to place the responsibilities upon local entities and described the State's responsibilities in no uncertain terms:
 

 The bottom line is that the State of North Carolina has consistently tried to avoid responsibility for the failures to provide at-risk students with the equal opportunity for a sound basic education in LEAs throughout the state by blaming the failures on lack of leadership and effort by the individual LEAs.
 

 The Supreme Court in
 
 Leandro
 
 clearly and unmistakably held to the contrary and found that the North Carolina Constitution provides every child with the right to receive an equal opportunity to a sound basic education and that it was the General Assembly, under Article IX, Section 2(1) that "has the duty of providing the children of every school district with access to a sound basic education." (
 
 Leandro,
 
 p. 353 [
 
 488 S.E.2d 249
 
 ] )
 

 This Court, following
 
 Leandro
 

 's
 
 mandate, has rejected the State of North Carolina's flawed argument that "it" is not responsible for educational failures in LEAs that are not providing their at-risk children with the equal opportunity to receive a
 sound basic education and has determined, just like the Supreme Court did on July 24, 1997, that the State is ultimately responsible and cannot abdicate its responsibility to the LEA.
 

 That having been said, the State's denial of responsibility fails as a matter of law. It is now, and always has been, the ultimate responsibility of the State to provide the equal opportunity to a sound basic education to all children. ( Article I, Section 15 ; Article IX, Section 2(1), North Carolina Constitution )
 

 This Court has, in accordance with
 
 Leandro
 
 , Ordered the State, not the LEAs, to fix the deficiencies that
 

 exist with at-risk children. This is so because the LEAs, like the counties themselves, are mere subdivisions of the State. The LEAs were created by the State for its own convenience in order to assist the State in performing its constitutional duty to provide each and every child with the equal opportunity to obtain a sound basic education through its free public school system. It is up to the Executive and Legislative Branches to provide the solution to the constitutional deficits with at-risk children.
 
 These branches can no longer stand back and point their fingers at individual LEAs, such as HCSS, and escape responsibility for lack of leadership and effort, lack of effective implementation of educational strategies, the lack of competent, certified, well-trained teachers effectively teaching children, or the lack of effective management of the resources that the State is providing to each LEA.
 

 The State of North Carolina must roll up its sleeves, step in, and utilizing its constitutional authority and power over the LEAs, cause effective educational change when and where required. It does not matter whether the lack of an equal opportunity to obtain a sound basic education is caused by teachers, principals, lack of instructional materials or other resources, or a lack of leadership and effort.
 

 The State must step in with an iron hand and get the mess straight. If it takes removing an ineffective Superintendent, Principal, teacher, or group of teachers and putting effective, competent ones in their place, so be it. If the deficiencies are due to a lack of effective management practices, then it is the State's responsibility to see that effective management practices are put in place.
 

 The State of North Carolina cannot shirk or delegate its ultimate responsibility to provide each and every child in the State with the equal opportunity to obtain a sound basic education, even if it requires the State to spend additional monies to do so.
 

 The State of North Carolina has steadfastly represented to this Court and to the citizens of North Carolina that the State is "continuing to appropriate additional funds and
 initiate new programs to assure that students enrolled in North Carolina public schools are receiving the opportunity to acquire a sound basic education."
 

 In the final analysis, if the State is true to its word about providing sufficient appropriate funding for each child to have the equal opportunity to obtain a sound basic education, the State should be able to correct the educational deficiencies which are denying at-risk children the equal opportunity to obtain a sound basic education by requiring LEAs that are not getting the job done to implement and maintain cost-effective, successful educational programs in their schools as required by
 
 Leandro
 
 . If not, then the State will have to look for other resources to get the job done.
 

 Make no mistake. While the State can require the LEAs to take corrective action, it remains the State's responsibility, through forceful leadership and effective management, to show an ineffective LEA, or an ineffective school within an LEA: (1) how to get the job done if the LEA's leadership and educational staff is ineffective and inept; (2) how to cost-effectively manage the resources which the State contends it so adequately provides to support each child's equal opportunity to receive a sound basic education; and (3) how to implement effective educational programs,
 using competent, well-trained certified teachers and principals.
 

 Id.
 

 (Italics omitted; bold added).
 

 Although plaintiffs are understandably not satisfied with the results produced by the orders in
 
 Leandro I
 
 and
 
 II
 
 , this Court cannot create a new constitutional right or a new claim where the Supreme Court has addressed the right in detail and the subject of this lawsuit is already under court oversight in another case.
 

 d.
 
 Defendant acting alone does not have the power to merge school districts, but the State does.
 

 "By holding the State accountable for the failings of local school boards, the trial court did not limit either: (1) the State's authority to create and empower local school boards through legislative or administrative enactments, or (2) the extent of any powers granted to such local school boards by the
 

 State." Leandro II
 
 ,
 
 358 N.C. at 635
 
 ,
 
 599 S.E.2d at 389
 
 .
 

 Plaintiffs necessarily rely upon
 
 Leandro I
 
 and
 
 Leandro II
 
 for the constitutional basis for their claim, but they also seek to distinguish this case from the
 
 Leandro
 
 cases by focusing on the taxing authority of the counties, the allocation of local tax revenues, and the existence of three school districts within Halifax County. Certainly, local tax revenues are an important factor in education, but that does not change our Supreme Court's rulings in
 
 Leandro I
 
 and
 
 Leandro II
 
 . North Carolina's system of taxation and school finance was essentially the same when
 
 Leandro
 
 was decided as it is now. In addition, financing of public schools is a complex system which extends from the federal government all the way down to the local school district, so we attempt only a brief and oversimplified overview of that system.
 

 The constitutional duty to provide a sound basic education rests upon the State, as directed by
 
 Leandro I
 
 ,
 
 346 N.C. at 353
 
 ,
 
 488 S.E.2d at 258
 
 , and
 
 Leandro II
 
 ,
 
 358 N.C. at 614-15, 635
 
 ,
 
 599 S.E.2d at 376
 
 , 389 ; obviously funding is an essential part of that responsibility. The State carries out this duty through the budget adopted by the General Assembly and administered through the State Board of Education and Department of Public Instruction. At the local level, the responsibility to provide public education is vested in the local boards of education.
 
 [7]
 
 The county commissioners have taxing authority and along with the Boards of Education, they establish the local county budget for the schools.
 
 See, e.g.
 
 , N.C. Gen. Stat. § 115C-429 (2015) ("Approval of budget; submission to county commissioners; commissioners' action on budget"). If a board of education believes the funds appropriated by a county to be inadequate, the remedy is in N.C. Gen. Stat. § 115C-431 (2015) ("Procedure for resolution of dispute between board of education and board of county commissioners"), which sets forth the exclusive process for mediation and litigation, if necessary. If the mediation fails, ultimately a jury may determine the proper budget for the schools.
 

 Id.
 

 Of course, federal funding and regulation also play important roles in public education. But regardless of the taxing authority of the county, the
 
 Leandro
 
 cases have answered the question of who bears the constitutional responsibility and have addressed issues of school funding at great length.
 

 Plaintiffs also stress the existence of three school districts within Halifax County: Halifax County Schools, Weldon City Schools, and Roanoke Rapids Schools. Plaintiffs allege that "Defendant's continued maintenance of three inadequately and inefficiently resourced and racially identifiable school districts prevents students in Halifax County from obtaining the opportunity to receive a sound basic education." In the Request for Relief, plaintiffs ask:
 

 1. That the Court find and conclude that Defendant's maintenance of three separate school districts obstructs Halifax County's students from securing the opportunity to receive a sound basic education;
 

 2. That the Court find and conclude that Defendant's maintenance of three separate school districts denies at-risk students in Halifax County the opportunity to receive a sound basic education;
 

 3. That the Court exercise its equitable powers and order the Board to develop and implement a plan to remedy the constitutional violations of its present education delivery mechanism and to ensure that every student in Halifax County is provided the opportunity to receive a sound basic education.
 

 As a practical matter, plaintiffs are asking this Court to require that the three school systems be merged, and we must take as true plaintiffs' allegations that having a single school district in Halifax County would allow a more equitable allocation of tax revenues and a better school administration. But the relief requested in Request 3 as quoted above is essentially what the court is already doing in the ongoing
 
 Leandro I
 
 and
 
 Leandro II
 
 litigation. Beyond that, even if merger of the local administration units in Halifax County would ameliorate the problems noted by plaintiffs, this defendant does not, on its own, have the authority to provide that relief. Under N.C. Gen. Stat. § 115C-67 (2015):
 

 City school administrative units may be consolidated and merged with contiguous city school administrative units and with county school administrative units upon approval by the State Board of Education of a plan for consolidation and merger submitted by the boards of education involved and bearing the approval of the board of county commissioners.
 

 County and city boards of education desiring to consolidate and merge their school administrative units may do so by entering into a written plan which shall set forth the conditions of merger....
 

 The plan referred to above shall be mutually agreed upon by the city and county boards of education involved and shall be accompanied by a certification that the plan was approved by the board of education on a given day and that the action has been duly recorded in the minutes of said board, together with a certification to the effect that the public hearing required above was announced and held. The plan, together with the required certifications, shall then be submitted to the board of county commissioners for its concurrence and approval. After such approval has been received, the plan shall be submitted to the State Board of Education for the approval of said State Board and the plan shall not become effective until such approval is granted. Upon approval by the State Board of Education, the plan of consolidation and merger shall become final and shall be deemed to have been made by authority of law and shall not be changed or amended except by an act of the General Assembly. The written plan of agreement shall be placed in the custody of the board of education operating and administering the public schools in the merged unit and a copy filed with the Secretary of State.
 

 Boards of Education can be merged in other ways. For example, a "city board of education" may dissolve itself:
 

 If a city board of education notifies the State Board of Education that it is dissolving itself, the State Board of Education shall adopt a plan of consolidation and merger of that city school administrative unit with the county school administrative unit in the county in which the city unit is located; provided, however, if a city school administrative unit located in more than one county notifies the State Board of Education that it is dissolving itself, the State Board shall adopt a plan that divides the city unit along the county line and consolidates and merges the part of the city unit in each county with the county unit in that county and the plans shall take effect on the same day. The plans shall be prepared and approved in
 accordance with G.S. 115C-67 as provided by general law, and G.S. 115C-68 as provided by general law, as applicable, except that the county and city boards of education and the boards of commissioners shall not participate
 by preparing, entering into, submitting, or agreeing to a plan, and the plan shall not be contingent upon approval by the voters.
 

 N.C. Gen. Stat. Ann. § 115C-68.2 (2015).
 

 In other words, the General Assembly has adopted a comprehensive set of statutes addressing the organization and merger of school districts, and the State retains the power to control the school districts and counties. Plaintiffs argue that only the county commissioners can
 
 initiate
 
 a merger plan for the school districts, but they acknowledge in their reply brief that such a plan must still be approved by the State and cannot be accomplished by the county commissioners alone. Plaintiffs here ask this Court to overlook the complex statutory framework governing educational administration and finance and to take on the role of the legislature in correcting the deficiencies in Halifax County by ordering the consolidation of the three school districts. In addition, plaintiffs ask the Court to order defendants to make this merger happen
 
 without
 
 the participation as parties of all three Boards of Education in Halifax County and the entities comprising "the State" vested with the constitutional and statutory responsibilities to provide education. Under
 
 Leandro I
 
 and
 
 II
 
 , this Court does not have that authority, and this defendant-the Halifax County Board of Commissioners-does not have that constitutional duty described in
 
 Leandro I
 
 or even the ability
 
 on its own
 
 to do what the plaintiffs ask. Although the Board of Commissioners surely has statutory duties related to education, still the State and all of the school boards within Halifax County would be necessary parties to any lawsuit seeking consolidation of the school boards.
 

 e.
 
 Counties are creatures of the State.
 

 "[C]ounties are merely instrumentalities and agencies of the State government."
 

 Martin Cnty. v. Wachovia Bank & Trust Co.
 
 ,
 
 178 N.C. 26
 
 , 31-32,
 
 100 S.E. 134
 
 , 137 (1919).
 

 Leandro II
 
 stressed that the constitutional duty is upon the State and not the school boards, which are creatures of the State.
 
 Leandro II
 
 ,
 
 358 N.C. at 635
 
 ,
 
 599 S.E.2d at 389
 
 . Counties do not differ from local school boards in this regard. Counties are also creatures of and instrumentalities of the State, with specific statutorily-assigned roles, but ultimately created by and controlled by the State:
 

 Counties are creatures of the General Assembly and serve as agents and instrumentalities of State government. Counties are subject to almost unlimited legislative control, except to the extent set out in the State Constitution. The powers and functions of a county bear reference to the general policy of the State, and are in fact an integral portion of the general administration of State policy.
 

 Counties serve as the State's agents in administering statewide programs, while also functioning as local governments that devise rules and provide essential services to their citizens.
 

 Stephenson v. Bartlett
 
 ,
 
 355 N.C. 354
 
 , 364-65,
 
 562 S.E.2d 377
 
 , 385 (2002) (citations, quotation marks, and brackets omitted).
 

 This Court clearly has stated that: In the exercise of ordinary governmental functions, counties are simply agencies of the State constituted for the convenience of local administration in certain portions of the State's territory, and in the exercise of such functions they are subject to almost unlimited legislative control except where this power is restricted by constitutional provision. As such, a county's powers[,] both express and implied, are conferred by statutes, enacted from time to time by the General Assembly. A county is not, in a strict legal sense, a municipal corporation, as a city or town. It is rather an instrumentality of the State, by means of which the State performs certain of its governmental functions within its territorial limits.
 

 Lanvale Props., LLC v. Cnty. of Cabarrus
 
 ,
 
 366 N.C. 142
 
 , 150,
 
 731 S.E.2d 800
 
 , 807 (2012) (citations, quotation marks, brackets, and ellipses omitted).
 

 The North Carolina Constitution does not limit the State in its control over local educational matters, including county taxation or school district organization, in
 any manner which would allow the State to abdicate its duties under
 
 Leandro I
 
 and
 
 II
 
 to provide a sound basic education or to give the defendant here a constitutional duty to provide a sound basic education. The General Assembly can create counties, change their boundaries, and prescribe their duties:
 

 The General Assembly shall provide for the organization and government and the fixing of boundaries of counties, cities and towns, and other governmental
 subdivisions, and, except as otherwise prohibited by this Constitution, may give such powers and duties to counties, cities and towns, and other governmental subdivisions as it may deem advisable.
 

 N.C. Const. art. VII, § 1.
 

 Our Supreme Court has long recognized the plenary power of the General Assembly over counties and over the creation and organization of school districts:
 

 In [a previous] case the Legislature had authorized the establishment of a graded school in two public school districts of Robeson County, subject to the will of the people to be ascertained in an election to be held. The board of commissioners undertook by order to include additional territory within the district. Denying this authority to be in the board of county commissioners, and speaking to the question, the Court said: "That it is within the power and is the province of the Legislature to subdivide the territory of the State and invest the inhabitants of such subdivisions with corporate functions, more or less extensive and varied in their character, for the purposes of government, is too well settled to admit of any serious question. Indeed, it seems to be a fundamental feature of our system of free government that such a power is inherent in the legislative branch of the government, limited and regulated, as it may be, only by the organic law. The Constitution of the State was formed in view of this and like fundamental principles. They permeate its provisions, and all statutory enactments should be interpreted in the light of them when they apply.
 

 "It is in the exercise of such power that the Legislature alone can create, directly or indirectly, counties, townships, school districts, road districts, and the like subdivisions, and invest them, and agencies in them, with powers corporate or otherwise in their nature, to effectuate the purposes of the government, whether these be local or general, or both. Such organizations are intended to be instrumentalities and agencies employed to aid in the administration of the government, and are always under the control of the power that created them, unless the same shall be restricted by some constitutional limitation. Hence, the Legislature may, from time to time, in its
 discretion, abolish them, enlarge or diminish their boundaries, or increase, modify or abrogate their powers[."]
 

 "Whenever such agencies are created, whatever their purpose or the extent or character of their powers, they are the creatures of the legislative will and subject to its control, and such agencies can only exercise such powers as may be conferred upon them and in the way and manner prescribed by law[.]"
 

 "[The Boards of County Commissioners] powers as the county board of education are derived from public school laws[.]"
 

 The decisions of this Court through the years since have been uniform in holding that the mandate of Art. IX of the Constitution of North Carolina for the establishment and maintenance of a general and uniform system of public schools is upon and exclusively within the province of the General Assembly. Laws passed in obedience to such mandate have been repeatedly approved and upheld by the decisions of this Court.
 

 Moore v. Bd. of Educ. of Iredell Cnty.
 
 ,
 
 212 N.C. 499
 
 , 501-02,
 
 193 S.E. 732
 
 , 733-34 (1937) (citations omitted).
 

 This Court has recognized the extent of the power the General Assembly has over counties: "The power to create, abolish, enlarge or diminish the boundaries of a county is vested exclusively in the legislature."
 
 Rowe v. Walker
 
 ,
 
 114 N.C. App. 36
 
 , 41,
 
 441 S.E.2d 156
 
 , 159 (1994),
 
 aff'd per curiam
 
 ,
 
 340 N.C. 107
 
 ,
 
 455 S.E.2d 160
 
 (1995). There are
 some constitutional prohibitions which prevent certain actions by the State regarding counties, but there is no constitutional prohibition on the State's power that would change the responsibility of the county commissioners in any manner relevant to this case.
 

 Speaking of the counties of this State, this Court has said ... [t]hese counties are not, strictly speaking, municipal corporations at all, in the ordinary acceptance of that term. They have many of the features of such corporations, but they are usually termed
 
 quasi
 
 -public corporations. In the exercise of ordinary governmental functions, they are simply agencies of the State, constituted for the convenience of local administration in certain portions of the State's territory; and, in the exercise of such functions, they are subject to almost unlimited legislative control, except
 when the power is restricted by constitutional provisions.... The weight of authority is to the effect that all the powers and functions of a county bear reference to the general policy of the state, and are in fact an integral portion of the general administration of state policy.
 

 Martin v. Bd. of Comm'rs of Wake Cnty.
 
 ,
 
 208 N.C. 354
 
 , 365,
 
 180 S.E. 777
 
 , 783 (1935) (citations and quotation marks omitted).
 

 The State has created, abolished, merged, and changed the boundaries of counties many times throughout North Carolina's history.
 
 See generally
 
 David Leroy Corbitt, The Formation of the North Carolina Counties 1663-1943, State Department of Archives and History (1950). In fact, the General Assembly created Halifax County in 1758 from a portion of Edgecombe County.
 
 See
 

 Martin Cty. v. Wachovia Bank & Trust Co.
 
 ,
 
 178 N.C. 26
 
 , 31-32,
 
 100 S.E. 134
 
 , 137 (1919), ("[T]he boundary of Martin County is the low-water mark on the south side of the river. This appears from ch. 4, Laws 1729; 25 St. Records, 212; 2 Rev. Stat. 164; which boundary is recognized by the subsequent acts creating Edgecombe County out of Tyrrell, Laws 1741, ch. 7; 23 St. Records, 164; 2 Rev. Stat. 124; the act creating Halifax [C]ounty out of the territory of Edgecombe, Laws 1758, ch. 13; 23 St. Records, 496; 2 Rev. Stat. 133; and, finally, the act creating Martin County out of Halifax and Tyrrell, Laws 1774, ch. 32; 25 St. Records, 976; 2 Rev. Stat. 145. Indeed, it has been the usual procedure by the act establishing new counties that where a river or other stream is the dividing line said river has remained within the limits of the county from which the new county has been taken. But counties are merely instrumentalities and agencies of the State government.").
 

 The General Assembly has in the past adopted legislation to accomplish the merger of school districts within a county. At oral argument, plaintiffs noted the constitutional limitations of N.C. Const. Art. II, § 24 (1)(h) on local legislation "changing the lines of school districts[,]" but our courts have held that the type of legislation which could address the merger of school systems in Halifax County is not unconstitutional. For example, in
 
 Guilford Cnty. Bd. of Educ. v. Guilford Cnty. Bd. of Elections
 
 ,
 
 110 N.C. App. 506
 
 , 508,
 
 430 S.E.2d 681
 
 , 683 (1993), the Guilford County Board of Education sought a declaratory judgment that a law entitled "An Act to Consolidate All of the School Administrative Units in Guilford County or to Provide for the Two City School Administrative Units in that County to have Boundaries Coterminous With the Cities, Subject to a Referendum" was unconstitutional as a local act. The Act in question was adopted to address the same types of problems with education opportunities as alleged by plaintiffs here:
 

 The Act recited that it was promulgated in order to better pursue the Guilford County school administrative units' common goals of excellence and equity in educational opportunity for all children "regardless of where the children reside or attend school within Guilford County, in order that the needs of all children attending school in Guilford County are met, regardless of the children's race, gender, or social or economic condition."
 

 Id.
 

 This Court found the law to be constitutional and not a "local act" even though it dealt only with Guilford County:
 

 The simple fact that the Act affects only Guilford County, rather than all of the
 counties in North Carolina, does not compel the conclusion that it is a local act. The number of counties excluded or included is not necessarily determinative, and a statute may be general even if it includes only one county. For the purposes of legislating, the General Assembly may and does classify conditions, persons, places and things, and classification does not render a statute "local" if the classification is reasonable and based on rational difference of situation or condition. We agree with the trial court that the Act meets the definition of a general law under both the
 
 Adams
 
 and the
 
 Emerald Isle
 
 tests. The students in Guilford County are a class which reasonably warrants special legislative attention and the provisions of the Act apply uniformly to all of the students. In deciding to consolidate the school administrative units of Guilford County, the Legislature made a rational distinction reasonably related to the Act's purpose to pursue the goals of excellence and equity in educational opportunity for all children of Guilford County. Merely because other counties in the State may have similar goals or needs does not preclude the General Assembly from passing legislation designed to address the needs of all students in a single county. Thus, we hold that the Act withstands the reasonable classification analysis.
 

 Application of the general public welfare analysis which the Supreme Court recognized in
 
 Emerald Isle
 
 also leads to the conclusion that the Act is a constitutional general law. Legislation which promotes equitable access to educational opportunity among all children attending
 public schools even in a single county is rationally related to the overall purpose of excellence and equity in our school system, which in turn promotes the general welfare of all citizens. Our Constitution specifically provides that religion, morality, and knowledge being necessary to good government and the happiness of mankind, schools, libraries, and the means of education shall forever be encouraged.
 

 Id.
 
 at 513-14,
 
 430 S.E.2d at 686-87
 
 (citations, quotation marks, and brackets omitted).
 

 The State may, by legislation, allow school districts or local governments authority to merge or change school districts, but the General Assembly still retains the power to change or revoke that authority.
 
 See, e.g.
 
 ,
 
 Kings Mountain Bd. of Educ. v. N. Carolina State Bd. of Educ.
 
 ,
 
 159 N.C. App. 568
 
 , 572,
 
 583 S.E.2d 629
 
 , 633 (2003) ("The ability to create the boundaries of a school district is vested solely within the power of the legislature, however. Thus, a municipality may not expand its school district boundaries without an express or implied delegation of legislative authority." (Citations omitted)). Indeed, consistent with Article IX, Section 2(2), the General Assembly has, by statute, assigned to units of local government the financial responsibility for many aspects of the free public schools. Our General Assembly has assigned to local governments, such as the Board, responsibility for: (1) "facilities requirements" for "a public education system," N.C. Gen. Stat. § 115C-408(b) (2015) ; (2) "the cost[s] of ... buildings, equipment, and apparatus" that the "boards of commissioners ... find to be necessary[,]" N.C. Gen. Stat. § 115C-521(b) (2015) ; (3) school buses and service vehicles, N.C. Gen. Stat. § 115C-249(a) - (b) (2015) ; (4) suitable supplies for the school buildings, including "instructional supplies, proper window shades, blackboards, reference books, library equipment, maps, and equipment for teaching the sciences," N.C. Gen. Stat. § 115C-522(c) (2015) ; and (5) providing "every school with a good supply of water," N.C. Gen. Stat. § 115C-522(c) (2015). Local boards of county commissioners are also responsible for "keep[ing] all school buildings in good repair," and ensuring that school buildings are "at all times in proper condition for use." N.C. Gen. Stat. § 115C-524(b) (2015).
 
 [8]
 

 The General Assembly created Halifax County and granted it any powers it may have; and the General Assembly retains its power to carry out its constitutional obligations under
 
 Leandro I
 
 and
 
 II
 
 to provide a sound basic education in Halifax County, regardless of the current arrangement of the school districts. In conclusion,
 
 Leandro I
 
 has answered the question of the State's constitutional obligation to provide a sound basic education, and defendant on its own simply does not have the power or authority to do what plaintiffs ask. Accordingly, the trial court's order granting defendant's motion to dismiss is affirmed.
 

 IV. Conclusion
 

 For the foregoing reasons, the trial court's order granting defendant's motion to dismiss is affirmed.
 

 AFFIRMED.
 

 Judge INMAN concurs.
 

 Chief Judge McGEE dissents with separate opinion.
 

 One of the plaintiffs was the Halifax County Board of Education.
 
 Leandro I
 
 ,
 
 346 N.C. at 336
 
 ,
 
 488 S.E.2d at 249
 
 .
 

 The Supreme Court noted in
 
 Leandro II
 
 that "the ensuing trial [on remand in
 
 Leandro I
 
 ] lasted approximately fourteen months and resulted in over fifty boxes of exhibits and transcripts, an eight-volume record on appeal, and a memorandum of decision that exceeds 400 pages. The time and financial resources devoted to litigating these issues over the past ten years undoubtably [sic] have cost the taxpayers of this state an incalculable sum of money. While obtaining judicial interpretation of our Constitution in this matter and applying it to the context of the facts in this case is a critical process, one can only wonder how many additional teachers, books, classrooms, and programs could have been provided by that money in furtherance of the requirement to provide the school children of North Carolina with the opportunity for a sound basic education."
 
 Leandro II
 
 ,
 
 358 N.C. at 610
 
 ,
 
 599 S.E.2d at 373
 
 .
 

 The term "local education agency," or "LEA," was first described in a
 
 Leandro II
 
 trial court order as follows: "In its data collection system, the State of North Carolina uses the term local education agency ('LEA') instead of the more familiar term school district. Accordingly, the Court's reference to school districts will use the term LEA so as to match up with the data."
 
 Hoke Cnty. Bd. of Educ. v. State
 
 , No. 95 CVS 1158,
 
 2000 WL 1639686
 
 , at *28 (N.C. Super. Oct. 12, 2000) (unpublished),
 
 aff'd in part as modified, rev'd in part
 
 ,
 
 358 N.C. 605
 
 ,
 
 599 S.E.2d 365
 
 (2004) ("
 
 Leandro II
 
 "). In
 
 Leandro II
 
 , the Supreme Court used the acronym "LEA," but defined it as "Local Educational Area" instead.
 
 Leandro II
 
 ,
 
 358 N.C. at 623
 
 ,
 
 599 S.E.2d at 381
 
 . But regardless of how an "LEA" is defined,
 
 Leandro I
 
 and
 
 II
 
 clearly placed the constitutional responsibility to provide a sound basic education on the
 
 State
 
 and not any local entity.
 
 See Leandro II
 
 ,
 
 358 N.C. at 635-36
 
 ,
 
 599 S.E.2d at 389
 
 .
 

 "[N.C. Gen. Stat.] § 115C-47. Powers and duties generally. In addition to the powers and duties designated in G.S. 115C-36, local boards of education shall have the power or duty: (1) To Provide the Opportunity to Receive a Sound Basic Education.-It shall be the duty of local boards of education to provide students with the opportunity to receive a sound basic education and to make all policy decisions with that objective in mind, including employment decisions, budget development, and other administrative actions, within their respective local school administrative units, as directed by law." N.C. Gen. Stat. § 115C-47(1) (2015).
 

 Some of the statutes listed above dictate that the financial responsibilities are to be shared between the "local boards of education" and the "tax-levying authorities."
 
 See, e.g.
 
 , N.C. Gen. Stat. § 115C-522(c) ; N.C. Gen. Stat. § 115C-524(b). The definition of "tax-levying authority" provided in the General Statutes includes, as relevant here, "the board of county commissioners of the county or counties in which an administrative unit is located[.]" N.C. Gen. Stat. § 115C-5(10) (2015).
 

 McGEE, Chief Judge, dissenting.
 

 This case requires us to decide whether a board of county commissioners has a constitutional duty to provide for a sound basic public education, consistent with
 
 Leandro v. State
 
 ,
 
 346 N.C. 336
 
 ,
 
 488 S.E.2d 249
 
 (1997) ("
 
 Leandro I
 
 ") and
 
 Hoke Cnty. Bd. of Educ. v. State
 
 ,
 
 358 N.C. 605
 
 ,
 
 599 S.E.2d 365
 
 (2004) ("
 
 Leandro II
 
 "), when aspects of the funding of public education have been statutorily assigned to those boards, consistent with Article IX, Section 2(2) of the North Carolina Constitution. The case arrives at this Court at a very early stage of the proceedings; the trial court granted defendant's motion to dismiss pursuant to N.C. Gen. Stat. § 1A-1, Rule 12(b)(6).
 

 Accepting plaintiff's factual allegations as true for the purposes of this appeal-as we must,
 
 see
 

 Bridges v. Parrish
 
 ,
 
 366 N.C. 539
 
 , 541,
 
 742 S.E.2d 794
 
 , 796 (2013) -and for the reasons that follow, I conclude that plaintiffs have stated a claim against defendant, and that a board of county commissioners is a proper defendant in a lawsuit seeking to assert a schoolchild's right to a sound basic public education under the North Carolina Constitution, when the inability to receive such an education is alleged to have resulted from actions or inactions of the board. This conclusion is not foreclosed by
 
 Leandro I
 
 or
 
 Leandro II
 
 , neither of
 which decided the question we confront in this case. I respectfully dissent from the majority's contrary holding.
 

 I.
 

 Plaintiffs argue that their complaint, taken as true, states a claim against defendant for a violation of the rights conferred by Article I, Section 15 and Article IX, Section 2 of the North Carolina Constitution, and the Board's choices "deprived plaintiffs of their constitutionally-guaranteed opportunity to receive a sound basic education." "It has long been understood that it is the duty of the courts to determine the meaning of the requirements of our Constitution."
 
 Mason v. Dwinnell
 
 ,
 
 190 N.C. App. 209
 
 , 217,
 
 660 S.E.2d 58
 
 (2008) (citation omitted). The majority aptly describes the facts and holdings of our Supreme Court in
 
 Leandro I
 
 and
 
 Leandro II
 
 , which need not be repeated at length. While the Supreme Court's interpretation of Article I, Section 15 and Article IX, Section 2 in
 
 Leandro I
 
 , and its analysis of what evidence is sufficient to prove a violation of the right to a sound basic education in
 
 Leandro II
 
 , provide guidance to this Court, neither of those decisions answers the precise question posited in this case-whether a local board of county commissioners may be held responsible for providing a sound basic public education for the students within their county. That question was not at issue in
 
 Leandro I
 
 nor
 
 Leandro II
 
 .
 
 See
 

 Leandro I
 
 ,
 
 346 N.C. at 341-42
 
 ,
 
 488 S.E.2d at
 
 251 ;
 
 Leandro II
 
 ,
 
 358 N.C. at 609-10
 
 ,
 
 599 S.E.2d at 373-74
 
 . After examining the constitutional text, the applicable General Statutes, and our Supreme Court's precedent on the matter, I would hold that plaintiffs have asserted allegations in their complaint that, if true, state a claim upon which relief may be granted against defendant.
 

 I begin with the fundamental principle, established by our Supreme Court in
 
 Leandro I
 
 , that Article I, Section 15 and Article IX, Section 2 of the North Carolina Constitution "combine to guarantee every child of this state an opportunity to receive a sound basic education in our public schools."
 
 Leandro I
 
 ,
 
 346 N.C. at 347
 
 ,
 
 488 S.E.2d at 255
 
 . This right is enforceable against the State and the State Board of Education, as our Supreme Court held in
 
 Leandro I
 
 and
 
 Leandro II
 
 .
 
 See
 
 N.C. CONST. art. I, § 15 ("The people have a right to the privilege of education, and it is the duty of the State to guard and maintain that right."); N.C. CONST. art. IX, § 2 (1) ("The General Assembly shall provide by taxation and otherwise for a general and uniform system of free public schools");
 
 Leandro I
 
 ,
 
 346 N.C. at 347
 
 ,
 
 488 S.E.2d at 255
 
 . The enforceability of the right, however, does not end there. Under Article IX, Section 2(2), boards of county commissioners have a role to play, if the General Assembly so instructs, as they may be assigned part of the responsibility for financial support
 of the public schools: "The General Assembly may assign to units of local government such responsibility for the financial support of the free public schools as it may deem appropriate." N.C. CONST. art. IX § 2 (2);
 
 see also
 

 Leandro I
 
 ,
 
 346 N.C. at 349
 
 ,
 
 488 S.E.2d at 256
 
 ("Article IX, Section 2(2) of the North Carolina Constitution expressly authorizes the General Assembly to require that local governments bear part of the costs of their local public schools.").
 

 Consistent with Article IX, Section 2(2), the General Assembly has, by statute, assigned to units of local government the financial responsibility for many aspects of the free public schools. The General Assembly has assigned to boards of county commissioners, such as the Board in this case, responsibility for,
 
 inter alia
 
 : (1) "facilities requirements" for "a public education system," N.C. Gen. Stat. § 115C-408(b) (2015) ; (2) "the costs of ... buildings, equipment, and apparatus" that the "boards of commissioners ... find to be necessary," N.C. Gen. Stat. § 115C-521(b) (2015) ; (3) school buses and service vehicles, N.C. Gen. Stat. § 115C-249(a) - (b) (2015) ; (4) suitable supplies for the school buildings, including "instructional supplies, proper window shades, blackboards, reference books, library equipment, maps, and equipment for teaching the sciences," N.C. Gen. Stat. § 115C-522(c) (2015) ; and (5) providing "every school with a good supply of water," N.C. Gen. Stat. § 115C-522(c) (2015). Local boards of county commissioners are also responsible for "keep[ing] all school buildings in good repair," and ensuring that school buildings are "at all times in proper condition for use." N.C. Gen. Stat. § 115C-524(b) (2015).
 
 [9]
 

 Article I, Section 15 and Article IX, Section 2 "combine" to impose on the State the responsibility to provide for a sound basic education for the children of North Carolina.
 
 Leandro I
 
 ,
 
 346 N.C. at 347
 
 ,
 
 488 S.E.2d at 255
 
 . Also, pursuant to the explicit terms of Article IX, Section 2(2), the State may assign to local boards of county commissioners-in the Constitution's language, the "units of local government"-financial responsibility for public schools. N.C. CONST. art. IX, § 2 (2). Given this right, established in
 
 Leandro I
 
 , and this assignment authority provided by the Constitution, I would hold that the guarantee of a sound basic education follows the assignment of financial responsibility, if made by
 the General Assembly. When the General Assembly assigns to boards of county commissioners the financial responsibility for aspects of public education, such as adequate facilities, equipment, water supplies, and learning materials, North Carolina schoolchildren must be able to pursue a declaratory action against those boards to assert that it has failed to adequately fund the aspects of public schooling assigned to it, and that such a failure has resulted in the lack of "an opportunity to receive a sound basic education in our public schools."
 
 Leandro I
 
 ,
 
 346 N.C. at 347
 
 ,
 
 488 S.E.2d at 255
 
 .
 With these principles in mind, I consider plaintiffs' complaint in the present case. In their complaint, plaintiffs allege that Halifax County Schools and Weldon City Schools lack the necessary resources to provide fundamental educational opportunities to the children in their school districts. Plaintiffs further complain of inadequate school facilities, crumbling ceilings, leaking pipes, sewage in the hallways, and a lack of adequate instructional materials in the majority-minority districts. These deficiencies, plaintiffs allege, are a direct result of defendant's funding choices, and have led to poor test scores by the schoolchildren and the inability to retain qualified teachers. Plaintiffs requested, in their complaint, that the court "exercise its equitable powers and order the Board to develop and implement a plan to remedy the constitutional violations of its present education delivery mechanism and to ensure that every student in Halifax County is provided the opportunity to receive a sound basic education." I would hold that, to the extent plaintiffs' complaint asserts that the children's inability to receive a sound basic public education is a result of the Board's inadequate funding of buildings, supplies, and other resources, responsibility for which was assigned to it by the General Assembly pursuant to Article IX, Section 2(2) of the North Carolina Constitution, plaintiffs have stated a claim upon which relief may be granted to assert their constitutional rights to a sound basic public education.
 

 II.
 

 The majority makes a variety of thoughtful arguments as to why plaintiffs' claims are foreclosed by our Supreme Court's holdings in
 
 Leandro I
 
 and
 
 Leandro II
 
 . I disagree, and briefly address those arguments. The majority opinion first asserts that the
 
 Leandro
 
 cases "began as a declaratory judgment action with the express purpose of determining the extent of the state constitutional right to a sound basic education
 
 and
 
 the entities responsible for providing that education," and that "
 
 Leandro I
 
 and
 
 Leandro II
 
 determined the correct parties and the entities legally responsible for providing a sound basic education under the
 North Carolina Constitution." (emphasis in original) (citing
 
 Leandro II
 
 ,
 
 358 N.C. at 611
 
 ,
 
 599 S.E.2d at
 
 374 ). However, the Court in
 
 Leandro II
 
 did not decide such a sweeping question; as explained by the Court, the
 
 Leandro
 
 cases were
 

 initiated as a declaratory judgment action ... [, and] commenced in 1994 when select students from Cumberland, Halifax, Hoke, Robeson, and Vance Counties, their respective guardians ad litem, and the corresponding local boards of education, denominated as plaintiffs, sought declaratory and other relief for alleged violations of the educational provisions of the North Carolina Constitution and the North Carolina General Statutes.
 

 Leandro II
 
 ,
 
 358 N.C. at 611
 
 ,
 
 599 S.E.2d at 374
 
 . Our Supreme Court never stated that it was determining the entire or exclusive group of entities responsible for providing a sound basic education. Rather, the Court determined the discrete legal question presented to it: whether the plaintiffs in that case "[had] a right to adequate educational opportunities which [was] being denied them by defendants[, the State of North Carolina and the State Board of Education,] under the current school funding system."
 
 Leandro I
 
 ,
 
 346 N.C. at 341
 
 ,
 
 488 S.E.2d at 252
 
 .
 
 Leandro I
 
 and
 
 Leandro II
 
 do not address whether other entities may be responsible under our Constitution for a sound basic public education.
 

 It is not surprising that the
 
 Leandro
 
 Courts did not address whether boards of county commissioners had any responsibility for a sound basic education under our Constitution, nor is it surprising that those Courts did not hold that a board of county commissioners may be held responsible if a student's inability to obtain a sound basic education is due to the board's funding decisions. No board of county commissioners was a party to that litigation, and the Court was not asked to determine whether a board of county commissioners had that responsibility. That question remains unanswered by our Courts.
 

 The majority opinion holds that all of the deficiencies alleged in plaintiffs' complaint, including poor educational performance, inadequate
 buildings, and lack of school supplies at the three school systems located within Halifax County, have already been addressed within the context of
 
 Leandro I
 
 and
 
 Leandro II
 
 , and that "if the 2009 consent order" that was entered by the superior court on remand from our Supreme Court's decision in
 
 Leandro I
 
 "has been violated, the court which entered that order should address the violation." However, as the majority opinion notes, the Board was not a party to the
 
 Leandro
 
 litigation. Therefore, the 2009 consent order-along with all of the ongoing supervision in that case-does not, and cannot, bind the Board or force it to act. While the Halifax County Board of Education was a party to the
 
 Leandro
 
 litigation, it was a plaintiff, not a defendant.
 

 The majority suggests a path forward for plaintiffs, writing that "rather than filing this separate lawsuit, the correct avenue for addressing plaintiffs' concerns in the present case
 
 would appear to be
 
 through the ongoing litigation in
 
 Leandro I
 
 and
 
 Leandro II
 
 ." (emphasis added).
 
 [10]
 
 But the
 
 Leandro
 
 cases' sole focus was on the funding provided by the State,
 
 not
 
 the local revenues collected and disbursed by boards of county commissioners, including the Board in the present case. It is
 
 these
 
 revenues that plaintiffs allege the Board is failing to disburse to the three school systems in Halifax County consistent with the constitutional right to a public education in the schools in this State. I do not see how plaintiffs, who were not parties in
 
 Leandro
 
 , could assert a claim in the ongoing
 
 Leandro
 
 litigation against defendant, also not a party in
 
 Leandro
 
 , seeking a larger portion of local revenues, which were not at issue in
 
 Leandro
 
 .
 

 The plain language of Article IX, Section 2(2) clearly recognizes "local responsibility" in public education, and provides that if the General Assembly assigns to "units of local government such responsibility for the financial support of the free public schools," those units of local government may use "local revenues to add to or supplement any public school[.]" N.C. CONST. ART. IX § 2 (2). The drafters of the Constitution contemplated that local revenues, which do not originate from the State, could be used to fund aspects of public education. As explained above, at this early stage in the proceedings plaintiffs have sufficiently alleged that the local boards of county commissioners must disburse these local revenues in a way that does not violate the constitutional right to a sound basic education established by our Supreme Court in
 
 Leandro I
 
 , and must be able to be held accountable for their failure to do so.
 

 III.
 

 The majority opinion states that, "[a]s a practical matter, plaintiffs are asking this Court to require that the three school systems [in Halifax County] be merged, and notes that defendant "does not, on
 its own, have the authority to provide that relief."
 
 See generally
 
 Section III(d),
 
 supra
 
 . I concur in that assessment, as I too, believe that plaintiffs have requested something-the merging of the three school systems geographically located in Halifax County-that defendant and this Court have no authority to provide. However, plaintiffs also requested that the court "exercise its equitable powers and order the Board to develop and implement a plan to remedy the constitutional violations ... to ensure that every student in Halifax County is provided the opportunity to receive a sound basic public education," and have also requested "such other and further relief as the [c]ourt may deem just and proper."
 

 This prayer for relief is broad and if, on remand, the trial court were to make findings and conclusions from competent evidence that the Board had violated a student's right to a sound basic education, the trial court would be able, as our Supreme Court held in
 
 Leandro I
 
 after declaring a right to a sound basic education, to "enter[ ] a judgment granting declaratory relief and such other relief as needed to correct" the constitutional violation.
 

 Leandro I
 
 ,
 
 346 N.C. at 357
 
 ,
 
 488 S.E.2d at 261
 
 (citation omitted).
 
 [11]
 
 The trial court would be entrusted with the duty to fashion an appropriate remedy which "minimiz[ed] the encroachment upon the other branches of government," including the Board and the General Assembly.
 

 Id.
 

 (citation omitted).
 

 IV.
 

 I respectfully dissent from the majority opinion's conclusion that the Board is not constitutionally responsible for public education, not even for those aspects of public education the General Assembly has seen fit to statutorily assign financial responsibility for, consistent with Article IX, Section 2(2) of the North Carolina Constitution. I would hold that plaintiffs have stated a claim upon which relief may be granted, to the extent that their complaint alleges that the schoolchildren are unable to receive a sound basic public education, and that inability is a result of the Board's inadequate funding of buildings, supplies, and other resources, responsibility for which was assigned to the Board by the General Assembly consistent with Article IX, Section 2(2) of the North Carolina Constitution. I would therefore reverse the trial court's order granting defendant's motion to dismiss pursuant to N.C.G.S. § 1A-1, Rule 12(b)(6), and remand for further proceedings. I respectfully dissent.
 

 Some of the statutes listed above dictate that the financial responsibilities are to be shared between the "local boards of education" and the "tax-levying authorities."
 
 See, e.g.
 
 , N.C. Gen. Stat. § 115C-522(c) ; N.C. Gen. Stat. § 115C-524(b). The definition of "tax-levying authority" provided in the General Statutes includes, as relevant here, "the board of county commissioners of the county or counties in which an administrative unit is located[.]" N.C. Gen. Stat. § 115C-5(10) (2015).
 

 Note that the majority does not definitively determine that plaintiffs may obtain relief through the suggested avenue. Just as the obligations of county commissioners was not at issue in
 
 Leandro I
 
 or
 
 Leandro II
 
 , whether plaintiffs may assert some sort of claim in the ongoing
 
 Leandro
 
 court supervision is not an issue presented for adjudication in the present case.
 

 It is important to note that this discussion is not focused on the
 
 right
 
 to a sound basic education-and whether such a right may be enforceable against the Board-but rather on what
 
 remedy
 
 may be available once a violation of that right is established.